### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

JANE DOE, a pseudonym,

    *Plaintiff,*

 v.

BAKER COUNTY, BAKER COUNTY
CORRECTIONS MANAGEMENT
CORPORATION, SCOTTY RHODEN,
RANDY CREWS, JAMES MESSER,
PEYTON PRESCOTT, BRIAN LOUIS
ROBINSON, ASSAILANT ROES 1-X,
CARDELL C. SMITH, and UNITED
STATES OF AMERICA,

    *Defendants.*

Jury Trial Demanded

Case No.: 3:23-cv-00609-MMH-LLL

### <u>SECOND AMENDED COMPLAINT</u>

Plaintiff Jane Doe, by and through her undersigned counsel, brings this civil action based upon the personal knowledge of Plaintiff and based upon the investigation of counsel, against Defendants BAKER COUNTY, BAKER COUNTY CORRECTIONS MANAGEMENT CORPORATION ("BCMCC"), SCOTTY RHODEN ("Rhoden"), Sheriff, in his official capacity, RANDY CREWS ("Crews"), Undersheriff, in his individual capacity, JAMES MESSER ("Messer"), Lieutenant, in his individual capacity, PEYTON PRESCOTT ("Peyton"), Deputy Sheriff, in his individual capacity, BRIAN LOUIS ROBINSON ("Robinson"), Deputy Sheriff, in his individual capacity, ASSAILANT ROES 1-X ("Assailant Defendants"), in their individual capacities, CARDELL C. SMITH ("Smith"), in his individual capacity as an Assistant Field Office Director for the Department of Homeland Security (DHS) U.S. Immigration and Customs Enforcement ("ICE"), and UNITED STATES OF AMERICA ("United States") (collectively

"Defendants" and each a "Defendant"). In support of Plaintiff's Second Amended Complaint (the "Complaint"), Plaintiff states as follows:

1.      This case arises from egregious breaches of the Plaintiff's constitutional rights, denial of medical care, and other critical oversights that led to the brutal rape, sexual assault, battery, torture, retaliation, and commercial sex trafficking of the Plaintiff at Baker County Detention Center ("BCDC"), located at 1 Sheriff's Office Drive, Macclenny, FL 32063. The Defendants' actions, along with pervasive dysfunction within BCDC, directly contributed to these atrocious offenses, causing profound and enduring harm to the Plaintiff.

### PARTIES

2.      Plaintiff is a resident of the State of Florida. At the time of the events alleged herein, Plaintiff was a permanent resident of the United States while detained at BCDC.

3.      Defendant Baker County is a political subdivision of the State of Florida located within the Middle District of Florida. At all relevant times, Baker County, by and through the Baker County Sheriff's Office ("BCSO"), acting pursuant to Florida law and an Operation, Management, and Maintenance Agreement ("OMMA") between the BSCO and BCCMC, contracted directly with and received federal funds from ICE for the housing of federal detainees at BCDC. At all relevant times, Baker County provided funding on an annual basis for the incarceration of detainees as BCDC. Baker County is a "person" for purposes of 42 U.S.C. 1983.

4.      Defendant BCCMC is a Florida nonprofit municipal corporation headquartered in Baker County, Florida. The BCCMC board is appointed by the Baker County Board of County Commissioners. BCCMC owns BCDC and is responsible for the facility's operations and management. At all times material to this Complaint, Defendant BCCMC was responsible for supervising Sheriff Deputies at BCDC, as required by the OMMA.

5.      At all times material to this Complaint, Defendant Rhoden was the Sheriff of the BCSO, a law enforcement agency for Baker County, Florida. Defendant Rhoden is the chief law enforcement official in Baker County. Under Florida law, Defendant Baker County has also designated Defendant Rhoden the chief custodian of BCDC. At all relevant times, Defendant Rhoden as the Sheriff of Baker County, received funding for his annual budget from Defendant Baker County. Plaintiff is suing Defendant Rhoden in his official and individual capacities.

6.      At all times material to this Complaint, Defendant Crews was the Undersheriff of the BCSO. His responsibilities included providing administrative and management assistance to the Sheriff, establishing, coordinating, and implementing departmental policies and procedures, negotiating, and interfacing with ICE officials, and ensuring compliance with federal, state, and local laws. Plaintiff is suing Defendant Crews in his individual capacity.

7.      At all times material to this Complaint, Defendant Messer was a Lieutenant of the BCSO. Defendant Messer was responsible for overseeing detainees in BCDC, including Plaintiff. Plaintiff is suing Defendant Messer in his individual capacity.

8.      At all times material to this Complaint, Defendant Prescott was a Deputy Sheriff of the BCSO. Defendant Prescott was responsible for overseeing detainees in BCDC, including Plaintiff. Plaintiff is suing Defendant Prescott in his individual capacity.

9.      At all times material to this Complaint, Defendant Robinson was a Deputy Sheriff of the BCSO. Defendant Robinson was responsible for overseeing detainees in BCDC, including Plaintiff. Plaintiff is suing Defendant Robinson in his individual capacity.

10.     Defendant Assailants Does 1-X (collectively "Assailant Defendants"), are individuals whose names are fully unknown to Plaintiff and who, at all times material to this Complaint, engaged in retaliatory conduct against Plaintiff at BCDC after she reported the sexual

assaults described further herein, and either acted at the direction of Defendants Rhoden and Crews, Prescott, Messer and Robinson, or with their knowledge.

11.     The Assailant Defendants functioned without facing consequences within BCDC, causing fear, and engaging in violence without restraint.

12.     Upon information be belief, the key members of the Assailant Defendants were:

      (a)    Defendant Messer, who assumed a leadership role;

      (b)    Defendant Prescott;

      (c)    BSCO Deputy "Kirkland," who was noted to be close friends with Defendant Robinson;

      (d)    BSCO Deputy "Curry"; and

      (e)    BSCO Deputy "Young Rhoden," believed to be a younger relative of Sheriff, Defendant Rhoden.

13.     At all times material to this Complaint, Defendant Smith was an Assistant Field Office Director ("AFOD") for ICE and stationed at the Jacksonville ICE Field Office. Assistant Director Smith has responsibility for and authority over the detention center where Plaintiff was detained. Thus, Defendant Smith is an immediate custodian of Plaintiff.

14.     Defendant United States of America ("United States")[1] is a sovereign that has waived its immunity for certain claims, including the claims set forth herein, and is liable to the same extent as a private individual for the tortious acts and omissions of its officers and agents committed during the performance of their official duties.

---

[1] The United States of America, Department of Homeland Security ("DHS") and ICE are collectively referred to as the "United States" in this paragraph and Counts IX and X of the Complaint.

15.     Here, the United States of America is liable for the tortious acts and omissions of Defendant Smith, the Assistant Field Office Director for ICE, and his subordinates, including ICE officer, Alberto Cornavaca.

16.     At all times material to this Complaint, Defendants were acting under color of state and/or federal law.

## JURISDICTION AND VENUE

17.     This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671, *et seq.*; the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1581 *et. seq.*, 28 U.S.C. §1346, *et seq.*; 42 U.S.C § 1983; Fifth and Fourteenth Amendments of the United States Constitution; and pendent state common and statutory laws.

18.     Any and all state law claims contained herein form part of the same case or controversy as gives rise to Plaintiff's federal law claims and therefore fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

19.     The amount in controversy in this matter exceeds the jurisdictional minimum limits set forth in 28 U.S.C. § 1332(a).

20.     Jurisdiction is appropriate pursuant to 28 U.S.C. §§ 1331, 1332, and 1346.

21.     The acts and omissions giving rise to this Complaint occurred in the State of Florida.

22.     Venue is proper in the Middle District of Florida, as the acts complained of occurred in this district.

## <u>GENERAL ALLEGATIONS</u>

### A.  The Agreement Between Defendants Baker County and BCCMC

23.     On July 17, 2018, Defendant Baker County entered into an Inmate Housing and Care Agreement ("IHCA") with Defendant BCCMC for the detention and care of "Baker Detainees". *See* Inmate Housing and Care Agreement as **<u>Exhibit A</u>** at p. 1.

24.     Defendant Baker County agreed to a fixed detainee rate under the IHCA to compensate Defendant BCCMC a rate of "$2,800.000.000" on a monthly basis. *Id*.

25.     Defendant Baker County required Defendant BCCMC to provide male/female beds for all Baker Detainees delivered to BCCMC and to house detainees and perform related detention services in accordance with the most current state and federal detention standards. *Id*. at p. 1, 2.

26.     Defendant BCCMC agreed to receive and discharge Baker Detainees to the BCSO. *Id*. at p. 2.

27.     Defendant BCCMC agreed to be responsible for providing on-site healthcare services for Baker Detainees. *Id*. Defendant BCCMC further agreed to provide Baker Detainees with safekeeping, housing, sustenance, medical and other services in accordance with the IHCA, and to ensure compliance with all applicable laws, regulations, fire and safety codes, policies and procedures. *Id*.

28.     Defendant BCCMC agreed to appoint a senior official to act as the Agreement Security Officer to interface with the BCSO on all security matters. *Id*. at p. 3.

29.     Defendant Baker County reserved the right to evaluate whether the detainee rate needed to be adjusted and the right to audit the actual and/or prospective costs upon which any rate adjustment was based. *Id*. at p. 4.

**B.  The Agreement Between Defendant BCCMC and BCSO**

30.    On August 15, 2017, the Baker Correctional Development Corporation[2], a predecessor to Defendant BCCMC, entered into an OMMA with the BCSO, governing their respective roles and responsibilities related to BCDC. *See* Amended and Restated Operation, Management, and Maintenance Agreement, attached as **Exhibit B**.

31.    Under the OMMA, Defendant BCCMC authorized Defendant Rhoden to detain, house, and control prisoners at BCDC, adhering to applicable laws and the OMMA. *Id.* at Section 2.01.

32.    Defendant Rhoden was responsible for the management, operation, and maintenance of BCDC and required to ensure that all services are performed professionally and comply with legal standards and the OMMA. *Id.* at Section 3.01.

33.    In exchange, Defendant BCCMC paid Defendant Rhoden a "Management Fee" of $200,000.00 annually from the BCDC facility revenue. *Id.* at Section 4.04.

34.    Defendant BCCMC required Defendant Rhoden to use his best efforts to maximize prisoner population at BCDC, aiming for optimal utilization. *Id*. at Section 3.05.

35.    In fact, Defendant BCCMC required Defendant Rhoden to accept and manage all prisoners referred to BCDC, with the goal of maximizing utilization of BCDC. *Id*. at Section 3.03.

36.    Defendant BCCMC maintained unlimited access to BCDC at any time and for any purpose and the right to inspect the operation of BCDC. *Id.* at Section(s) 2.01, 11.04.

37.    In fact, pursuant to Section 11.01, Defendant BCCMC maintained office space at BCDC for its representatives to carry out its responsibilities as the Owner of BCDC. *Id.*

---

[2] On October 9, 2018, Defendant BCCMC purchased the assets and liabilities of the Baker Correctional Development Corporation and as part of the sale, accepted the assignment of the OMMA.

38.    Pursuant to Section 4.01 of the OMMA, all revenue collected by Defendant Rhoden and the BCSO for the operation of BCDC was the exclusive property of Defendant BCCMC, and Defendant Rhoden was obligated to assign all such revenue to Defendant BCCMC. *Id.*

39.    Defendant BCCMC managed all funds for the operation and maintenance of BCDC and reserved the right to audit any operating records of BCDC for any purpose. *Id.* at Section(s) 4.02, 11.02.

### C.  The Agreement Between ICE and the BCSO

40.    In August 2009, the BCSO signed an Intergovernmental Service Agreement ("IGSA") with ICE to house people in immigration detention at BCDC.

41.    Pursuant to the IGSA, these persons were in custody of ICE as Administrative Detainees, meaning they were held solely to ensure their availability during the immigration removal process, without criminal charges.

42.    The IGSA required ICE to pay the BSCO a fixed amount per detained individual per day—an amount described in the contract as the "detainee day rate."

43.    In exchange, the BCSO agreed to provide detained individuals with "safekeeping, housing, subsistence, medical and other services."

44.    Accordingly, the IGSA required the BCSO "to house detainees and perform related detention services in accordance with the most current edition of ICE National Detention Standards"—presently, the 2019 PBNDS.[3]

---

[3] ICE, National Detention Standards for Non-Dedicated Facilities (rev. 2019), available at https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf (last accessed April 30, 2024).

### D. Prison Rape Elimination Act (PREA)

45.     In 2003, Congress enacted the Prison Rape Elimination Act ("PREA"), which found, among other things, that (1) "[m]ost prison staff are not adequately trained or prepared to prevent, report, or treat inmate sexual assaults," (2) "[p]rison rape often goes unreported, and inmate victims often receive inadequate treatment for the severe physical and psychological effects of sexual assault--if they receive treatment at all," and (3) "[v]ictims of prison rape suffer severe physical and psychological effects that hinder their ability to integrate into the community and maintain stable employment upon their release from prison." 34 U.S.C. § 30301. Congress further found that "[t]he high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution," and "[s]tates that do not take basic steps to abate prison rape" demonstrate "indifference" to those constitutional rights. *Id*.

46.     DHS and ICE explicitly incorporated PREA standards into their policies in 2007, and in 2012, DHS issued its specific PREA National Standards. 6 C.F.R. § 115.

47.     In addition, acknowledging the significant power imbalance between immigration officers/staff and detainees, ICE has strictly prohibited any sexual activity involving officers and detainees. Specifically, officers and staff are forbidden from "[e]ngaging in, or attempting to engage in a sexual act with any resident or the intentional touching of a resident's genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person" and further noted that "[s]exual acts or contacts between a resident and a staff member, even when no objections are raised, are always illegal." *Id*.

48.     Additionally, recognizing the inherent power dynamics between immigration officers/staff and the detainees in their custody, ICE further prohibited officers/staff from "[e]ngaging in, or attempting to engage in a sexual act with any resident or the intentional touching

of any resident's genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person" and further noted that "[s]exual acts or contacts between a resident and a staff member, even when no objections are raised, are always illegal." *Id*.

49.     Congress promulgated PREA regulations in 2012. *See* 28 C.F.R. § 115 *et seq.* Section 2.11 was added to 2019 PBNDS to comply with DHS PREA standards.

50.     At all times relevant, Defendants Baker County, BCCMC and the BCSO were contractually responsible for complying with the IGSA and all applicable federal laws incorporated by it, including, but not limited to, PREA, the Federal Acquisition Regulations (FAR), Homeland Security Acquisition Regulations (HSAR), OMB Circular A-87, and the Federal Records Act.

**E.  ICE's Detention Standards Governing Sexual Assault Within BCDC**

51.     In October 2012, BCDC incorporated the 2011 PBNDS 2.11 – Sexual Abuse and Assault Prevention and Intervention – into its IGSA by way of contract modification, which remained applicable at all relevant times.

52.     As particularly relevant here, 2011 PBNDS 2.11 requires "facilities that house detainees act affirmatively to prevent sexual abuse and assaults on detainees; provide prompt and effective intervention and treatment for victims of sexual abuse and assault; and control, discipline and prosecute the perpetrators of sexual abuse and assault." 2011 PBNDS 2.11.

53.     Recognizing the inherent power dynamics between immigration officers/staff and the detainees in their custody, PBNDS 2.11 explicitly prohibits sexual abuse and assault of a detainee by a staff member, including and among other things: "(a) contact between the penis and the vagina or anus . . . involving the penis upon penetration, however slight; (b) contact between

the mouth and the penis, vulva or anus; (c) penetration, however slight, of the anal or genital

opening of another person by a hand or finger . . . (d) intentional touching of the genitalia, anus,

groin, breast, inner thighs or buttocks, either directly or through the clothing, that is unrelated to

official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse,

or gratify sexual desire; (e) threats, intimidation, harassment, indecent, profane or abusive

language, or other actions or communications aimed at coercing or pressuring a detainee to engage

in a sexual act; (f) repeated verbal statements or comments of a sexual nature to a detainee; (g) any

display of [a staff member, contractor, or volunteer's] uncovered genitalia; and (h) voyeurism . . .

[w]here not conducted for reasons relating to official duties." *Id.*

54.    Furthermore, "[s]taff, contractors, volunteers, and detainees shall not retaliate

against any person, including a detainee, who reports, complains about, or participates in an

investigation into an allegation of sexual abuse, or for participating in sexual abuse as a result of

force, coercion, threats, or fear of force." *Id.*

55.    Additionally, "[d]etainee victims of sexual abuse shall be provided emergency

medical and mental health services and ongoing care. All treatment services, both emergency and

ongoing, shall be provided to the victim without financial cost and regardless of whether the victim

names the abuser or cooperates with any investigation arising out of the incident." *Id.*

56.    As noted, 2011 PBNDS 2.11 is incorporated into the IGSA, thereby imposing

contractual obligations on the BCSO.

**F. ICE's Obligations for Immediate Response and Support for Detainees Reporting Sexual Assault**

57.    In May 2012, ICE issued the agencywide Directive 11062.1, Sexual Abuse and

Assault Prevention and Intervention (SAAPI), which established a zero-tolerance policy for sexual

abuse and assault of all individuals in ICE custody, and outlined duties of ICE employees for

timely reporting, coordinating response and investigation, and effective monitoring of all incidents of sexual abuse or assault.[4] ICE revised and reissued the ICE SAAPI Directive in May 2014 to incorporate the additional agency requirements established under DHS PREA.[5] *See* ICE SAAPI Directive No. 11062.1: Sexual Abuse and Assault Prevention and Intervention (2014), attached as **Exhibit C**.

58.     The SAAPI Directive mandates that the Field Office Directors (FODs) oversee the implementation of its procedures, which are guided by the PBNDS 2011 Standard 2.11.

59.     The FODs are responsible for ensuring that all detention facility staff are aware of their obligations under ICE's policies and the PBNDS. This includes training on how to respond to allegations and the necessity of providing comprehensive medical and mental health services to victims.

60.     The SAAPI Directive mandates that all ICE employees must immediately report any knowledge, suspicion, or information concerning an incident of sexual abuse or assault involving an individual under ICE custody. The supervisor or a designated official shall report the allegation to the Field Office Director (FOD), AFOD, such as Defendant Smith, or Special Agent in Charge (SAC), as appropriate.

61.     According to the SAAPI Directive, it is a strict policy of ICE that no employee shall engage in retaliation against any individual, including detainees, who reports, lodges a complaint about, or participates in an investigation concerning an allegation of sexual abuse or assault.

---

[4] ICE SAAPI Directive No. 11062.1: Sexual Abuse and Assault Prevention and Intervention (2012), http://www.ice.gov/doclib/foia/dro_policy_memos/sexual-abuse-assault-prevention-intervention-policy.pdf (last accessed April 30, 2024).
[5] All references to the SAAPI hereafter are to the 2014 Directive.

62.     Should an incident of sexual abuse occur within the ICE custody, specific procedural steps are to be followed by the FOD, including offering the alleged victim immediate protection from the assailant and employing a multidisciplinary team approach to handle the allegation.

63.     Additionally, the SAAPI Directive has clear directives to avoid penalizing the victim for reporting the abuse or for any sexual activity resulting from force or coercion.

64.     Additionally, the FOD is responsible for ensuring that the alleged victim is placed in the least restrictive and most supportive housing option available, and that the use of administrative segregation, if necessary, does not exceed 5 days.

65.     Moreover, the FOD must ensure the ongoing safety and security of the victim, along with providing adequate medical and mental health care.

66.     Specifically, **for at least 90 days following a report of sexual abuse or assault, FODs must monitor to see if there are facts that suggest possible retaliation by detainees or staff, and act promptly to remedy any such retaliation**.

67.     In order to safeguard the victim's welfare, the SAAPI Directive stipulates that considerations should include moving the victim to a less restrictive setting within the same jurisdiction while an investigation is active. Additionally, it may be appropriate to transfer the victim to a hospital or consider other suitable custody options such as another detention center to ensure their safety and well-being during the ongoing investigation.

68.     As detailed further below, none of the safeguards required by the SAAPI were following for Plaintiff.

69.     In fact, DHS' 2019 inspection of BCDC specifically states that "there were no allegations of staff-on-detainee sexual assault or abuse." *See* 2019 Annual Detention Inspection of the Baker County Detention Center, attached as **Exhibit D**, p. 4.

70.     DHS' 2019 inspection of BCDC, conducted from May 29-31, 2019, occurred while, upon information and belief, Plaintiff was already isolated in solitary confinement.

**G. ICE's Stringent Oversight and Accountability for Detainees in Solitary Confinement[6]**

71.     DHS' Office of Inspector General ("OIG") acknowledges that "FODs are responsible for managing detention operations in their geographic area."[7]

72.     Specifically, ICE has issued stringent directives mandating that FODs and AFODs, such Defendant Smith, rigorously oversee the use of solitary confinement at its detention centers, including BCDC for individuals such as the Plaintiff. *See* ICE Policy No. 11065.1, Review of the Use of Segregation for ICE Detainees (2013) (hereafter, "ICE Solitary Confinement Directive"), attached as **Exhibit E**.

73.     According to the ICE Solitary Confinement Directive, when a detainee with a special vulnerability is placed in solitary confinement for any length of time, the detention facility must notify the appropriate FOD as soon as possible but no later than 72 hours after the initial placement into solitary confinement. Upon notification, the FOD is to immediately notify the Custody Management Division (CMD) at ICE headquarters about the placement.

74.     Detainees with special vulnerabilities include those who are known to be suffering from mental illness or serious medical illness; who have a disability or are elderly, pregnant, or

---

[6] ICE refers to solitary confinement as "Segregation".

[7] U.S. Dep't of Homeland Security Office of Inspector General, Concerns about ICE Detainee Treatment and Care at Detention Facilities, OIG-18-32, at 12 n.17 (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf (last accessed, April 30, 2024).

nursing; who would be susceptible to harm in general population due in part to their sexual orientation or gender identity; or **who have been victims - in or out of ICE custody- of sexual assault, torture, trafficking, or abuse.**

75.    The ICE directive also requires detention facilities to notify FODs whenever any detainee has been held continuously in solitary confinement for 14 days, 30 days, and at every 30-day interval thereafter, or has been held in solitary confinement for 14 days out of any 21-day period.

76.    Upon notification by the detention facility, FODs must review these cases of continued solitary confinement to assess their appropriateness, based on applicable detention standards and policies.

77.    Furthermore, ICE shall take additional steps to ensure appropriate review and oversight of decisions to retain detainees in segregated housing for over 14 days, or placements in segregation for any length of time in the case of detainees for whom heightened concerns exist based on known special vulnerabilities and other factors related to the detainee's health or the risk of victimization.

78.    Most importantly, it is the responsibility of the FOD to ensure all detention facilities in his or her area of responsibility (AOR) are aware of the notification requirements under this policy, as well as their obligations under relevant detention standards and ICE policies on the appropriate use of solitary confinement.

79.    Furthermore, ERO field offices and ICE headquarters use the Segregation Review Management System (SRMS), a centralized web-based system, to document, track, and facilitate review of all solitary confinement cases. Under SRMS guidance, ERO field office staff, including

FODs, are required to use this system to report data on solitary confinement placements as specified by ICE directives.

80.    Once a FOD notifies CMD about a solitary confinement placement, CMD must notify other ICE stakeholders, including the headquarters' Domestic Operations Division, Office of Detention Policy and Planning, and IHSC.

81.    ICE headquarters' offices use data from SRMS to jointly review and evaluate the appropriateness of solitary confinement and coordinate recommendations for alternatives to solitary confinement.

82.    ICE headquarters also convenes weekly meetings of a multidisciplinary team, including representatives from the medical provider at the Detention Center, Domestic Operations Division, Office of the Principal Legal Advisor, and Office of Detention Policy and Planning.

83.    In these meetings, the team oversees and reviews facility solitary confinement decisions by using data from SRMS to assess solitary confinement placements of individual detainees with special vulnerabilities.

84.    Moreover, on these issues, DHS-OIG makes several recommendations specifically for FODs and AFODs, such as Defendant Smith for the protection of ICE detainee basic rights. The first is to "[e]nsure that [ERO] FODs and AFODs are properly conducting reviews of solitary confinement decisions required by ICE policies and are held accountable for properly documenting that required reviews have been completed in the specified timeframe."

85.    ICE concurred with this request and acknowledged "the need for enhanced oversight mechanisms to ensure that [FODs] and [AFODs] are properly conducting reviews and held accountable to document the required reviews have been completed in the specified timeframe."

86.    Overall, ICE segregation or solitary confinement should not be punitive for detainees with special vulnerabilities, and it is the duty of FODs and AFODs, such as Defendant Smith, to ensure this.

87.    In particular, placement in administrative segregation due to a special vulnerability should be used only as a last resort and when no other viable housing options exist.

88.    ICE's standards and various court decisions emphasize the importance of minimizing the use of segregation for vulnerable populations and require additional protections to ensure their safety and well-being. These practices are meant to prevent undue harm and ensure humane treatment while in custody.

89.    Unfortunately, despite these policies and protections, none were followed in the case of the Plaintiff, who was placed in solitary confinement for nearly two months after reporting a rape and sexual assault by Defendant Robinson.

**H. The Trafficking Victims Protection Act (TVPA)**

90.    The exploitation of vulnerable people is so common that Congress has passed the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1581 *et. seq*., a comprehensive statutory framework imposing both criminal and civil liability, *see* 18 U.S.C. § 1595, on any persons engaging or *attempting to engage* or benefit from sexual exploitation and trafficking or obstructing anti-trafficking enforcement.

91.    Specifically, the TVPA punishes anyone who "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or . . .benefits, financially or by receiving anything of value, from participation in a [trafficking] venture" while knowing "that means of force, threats of force, fraud, coercion . . . will be used to

cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a); *see* 18 U.S.C. § 1594 (prohibiting attempted trafficking and conspiracy to traffic).

92.    Coercion means "threats of serious harm to or physical restraint against any person . . . any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person" or "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2).

93.    The TVPA allows "[a] individual who is a victim of a violation of this chapter [to] bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees." 18 U.S.C. § 1595(a).

94.    "Serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

95.    Commercial sex act "means any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C § 1591(e)(3).

96.    The TVPA also punishes anyone who "obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section," 18 U.S.C. § 1591(d), and makes it a separate offense for "participat[ing] in a venture" which violates the TVPA. 18 U.S.C. § 1591(e)(4).

97.     The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity. 18 U.S.C. § 1591(e)(6).

98.     Congress grants a plaintiff up to ten (10) years in which to bring a civil action under 18 U.S.C. § 1595(c).

**I.    Blind Spots at BCDC, Where Sexual Assault had Occurred and Could Occur Again, were Known to Defendants, who were Aware of Prior Similar Incidents**

99.     Plaintiff's rape and sexual assault at BCDC is part of a disturbing pattern of incidents.

100.    In 2014, BSCO Deputy Tarrece Darrell Givens was convicted of three counts of sexual abuse, violating FL ST § 951.221.1 (Sexual Misconduct by a Detention Facility Employee). *See State of Florida v. Tarrece Darnell Givens*, Case No: 02-2013-CF-050-A (8th Judicial District, Baker County, Florida).

101.    Specifically, Deputy Givens made inappropriate sexual advances toward a female detainee over several days, culminating in a sexual assault in the recreation area of BCDC, where he forced her to perform oral sex.

102.    Givens led the detainee to an area of BCDC without security cameras to avoid surveillance.

103.    The detainee was able to prove the assault by preserving a paper with Givens' bodily fluids and hiding it in her cell.

104.    The conduct of Deputy Givens highlights a troubling history of sexual misconduct at BCDC, marked by subsequent incidents.

105.    Defendants knew areas of BCDC were unsupervised and camera-less, and knew or should have known that detention officers and guards, including Defendant Robinson, took

detainees, such as the Plaintiff, to unsupervised, camera-less areas of BCDC for inappropriate, improper, and illegal purposes.

106.    Specifically, the BCSO's 2019 PREA Annual Statistical Report concedes that staff at BCDC had identified areas considered to be security concerns due to a lack of video monitoring despite there being 96 fixed video surveillance cameras around the facility.

107.    In 2018, the BCSO aimed to implement 28 additional cameras in BCDC to cover known and identified blind spots.

108.    However, at the time of the Plaintiff's sexual assault and battery, including rape, no additional cameras had been installed, leaving blind spots in the BCDC, including the janitor's closet of the law library where the Plaintiff was raped as detailed below.

109.    Furthermore, prior to the Plaintiff's sexual assault and battery, including rape, no additional security staff were added deter sexual abuse and cover the blind-spots, increasing the risk of mistreatment, including rape, for detainees in general and Plaintiff in particular.

**J.  Defective Implementation and Operation of Guardian RFID System**

110.    At all relevant times, BCDC was equipped with a Radio Frequency Identification (RFID) system, known as "Guardian RFID," to monitor various security functions within the facility, including documenting and tracking the location of detainees and BSCO staff.

111.    Defendant Messer was responsible for implementing this security check system but failed to ensure its proper functioning.

112.    Specifically, the Guardian RFID system was defective, allowing detention officers to bypass its functionality by neglecting to manually input log information into the system.

113.    Each BSCO officer was provided with a handheld device used in conjunction with the Guardian RFID system for scanning detainees' cards or armbands, retrieving essential information about them, and pinpointing their location within BCDC.

114.    The defective implementation of Guardian RFID allowed for significant lapses in security, as officers could easily circumvent the system by neglecting to input essential information.

115.    Defendants Messer, Rhoden, Crews and BCCMC failed to address the systemic issues with the Guardian RFID system, leading to its ineffective operation and the inability to accurately track the movement of detainees.

116.    Due to the defective implementation of Guardian RFID, officers were able to bypass its intended functionality by neglecting to input information into their logs, rendering it incapable of retaining accurate records of inmate activities and movements.

117.    During Plaintiff's confinement at BCDC, the Guardian RFID system remained defective, resulting in significant lapses in security, compromising the safety of all detainees, and the deficiencies in these procedures further facilitated the sexual assault of Plaintiff.

## K. Defendant Robinson Sexually Assaulted and Raped Plaintiff, Gave Plaintiff Goods in Exchange for Sexual Acts, and Coerced and Threatened Plaintiff

118.    At all times relevant hereto, Defendants Rhoden, Crews, Messer, Prescott, Robinson, and the Assailant Defendants were employed by the BCSO and assigned to BCDC.

119.    At all relevant times, Plaintiff was and is a Permanent Resident of the United States and has maintained that legal status since September 17, 1995.

120.    Plaintiff arrived at BCDC on or about February 25, 2019.

121.    From February 25, 2019 through July 30, 2019, Defendant Robinson assaulted Plaintiff on several occasions while she was under the custodial, supervisory, and disciplinary authority of Defendants and detained at BCDC.

122.    Defendant Robinson inappropriately intimidated, coerced, victimized, and sexually battered Plaintiff by, among other things, putting his hands underneath Plaintiff's clothes and underwear, and inserting his finger into Plaintiff's vagina on at least 3 occasions in April 2019.

123.    On one occasion in April 2019, Defendant Robinson went to Plaintiff's cell, commanded Plaintiff to come to the cell door, and under the guise that he was giving her toilet paper moved Plaintiff's undergarments and digitally penetrated Plaintiff's vagina with his finger while using the toilet paper in his other hand to obstruct view of the sexual assault.

124.    On another occasion, on or about April 22, 2019, Defendant Robinson again came to Plaintiff's cell, this time with 2 new BCDC detainee uniforms, underwear and sports bras, commanded Plaintiff to come to the cell door, and again moved Plaintiff's undergarments and digitally penetrated Plaintiff's vagina with his finger. During the sexual assault, Defendant Robinson represented to Plaintiff that the digital penetration was because of her birthday, which was within the next few days.

125.    That same night, Defendant Robinson returned to Plaintiff's cell for a second time with chocolate chip cookies, this time entering Plaintiff's cell and finding Plaintiff asleep in her bed. Plaintiff was woken up, startled, by Defendant Robinson groping and attempting to digitally penetrate her.

126.    Plaintiff attempted to fend off the sexual assault by using her blanket as a shield between her and Defendant Robinson, which prompted him to threaten Plaintiff that she would face consequences for not complying to his sexual commands. Defendant Robinson then told

Plaintiff that he brought her the cookies for her birthday and left the cell. Plaintiff flushed the cookies down the toilet and cried herself to sleep.

127.    On or about May 25, 2019, Defendant Robinson inappropriately intimidated, coerced, victimized, and sexually battered Plaintiff. Defendant Robinson retrieved Plaintiff from her cell under the guise that she had a call from a legal representative, and ordered her to go to the law library. However, there was no call scheduled and once Plaintiff was in the law library, Defendant Robinson ordered her into a janitor's closet within the law library.

128.    Inside the janitor's closet, Defendant Robinson turned Plaintiff around so she was no longer facing him, slammed Plaintiff into the wall, placing pressure on Plaintiff's back and forcing Plaintiff's right shoulder and right breast into the wall. Defendant Robinson then forced Plaintiff's pants down and penetrated her vaginally with his penis.

129.    The pressure Defendant Robinson applied to Plaintiff's back was so severe that it caused Plaintiff's right breast implant to rupture during the violent rape.

130.    In an attempt to fight off this violent rape, Plaintiff first physically resisted Defendant Robinson, but she was unable to stop him because he was physically stronger than Plaintiff.

131.    As a final effort, Plaintiff told Defendant Robinson that she could become pregnant if he continued this heinous act and, upon hearing this, Defendant Robinson ordered Plaintiff to perform oral sex and then ejaculated in Plaintiff's mouth and on her bra.

132.    The ejaculate on this bra was later confirmed to be 700 billion times more likely to be Defendant Robinson's then an unrelated individual by the Florida Department of Law Enforcement ("FDLE").

133.    From approximately February 25, 2019 through July 30, 2019, Defendant Robinson verbally demanded sexual favors and verbally harassed Plaintiff.

134.    From approximately February 25, 2019 through July 30, 2019, Defendant Robinson represented to Plaintiff that he would fabricate criminal charges against her to ensure she was removed from the United States.

135.    From approximately February 25, 2019 through July 30, 2019, Defendant Robinson gave Plaintiff commercial goods of value in connection with the sexual acts he performed on Plaintiff and/or ordered Plaintiff to perform on him.

136.    The commercial goods of value included toilet paper, feminine pads, cleaning supplies, gum, books, pictures, fruits, cookies, new uniforms, and undergarments. The commercial goods were items of value that detainees at BCDC would need to purchase from the commissary, some of which were sold in limited capacity by the commissary. At all times, toilet paper and feminine pads were of extreme value in BCDC and often used as a form of currency by detainees.

137.    The commercial goods Defendant Robinson exchanged Plaintiff were intended to groom Plaintiff for sexual acts, acting as payment in exchange for the sexual acts and to purchase her silence for the sexual acts.

138.    Defendant Robinson's provision of commercial goods to Plaintiff was a conspicuous action that exceeded the normal allocation of items typically given to detainees. This behavior was widely recognized by both other detention officers and inmates, highlighting its deviation from standard practice.

139.    As evidenced by Plaintiff's resistance to Defendant Robinson's violent rape and continued demands for sexual favors, Plaintiff did not consent at any time to these sexual acts and assaults.

140.    Moreover, under PREA National Standards, 6 CFR 115, any sexual act perpetrated by Defendant Robinson would always be considered illegal, and thus Plaintiff could never offer consent, nor could Defendant Robinson reasonably construe any action or inaction on her part as evidencing consent.

141.    Upon information and belief, no PREA Incident Report was ever prepared documenting Defendant Robinson's sexual assaults and violent rape of Plaintiff.

142.    At all times, Plaintiff feared further abuse, feared retaliation, and feared for her life if she reported Defendant Robinson.

143.    In the days that followed the on or about May 25, 2019 forcible vaginal and oral rape, Plaintiff was so traumatized by what had occurred that she could not eat for three to four days; instead, she remained in her cell until she was forcibly taken to be fed by detention officers.

144.    On or about February 16, 2024, Defendant Robinson was found guilty of three counts of sexual abuse in violation of FL ST § 951.221.1 (Sexual Misconduct by a Detention Facility Employee) and three counts of sexual FL ST § 94.011.4b (Sexual Battery), by engaging in sexual acts with Plaintiff, who was under the custodial, supervisory, and/or disciplinary authority of Defendants. *See State of Florida v. Brian Louis Robinson*, Case No. 02-2019-CF-000382-CFAM (8th Judicial District, Baker County, Florida).

145.    On May 1, 2024, Defendant Robison received a 25-year prison sentence to state confinement, followed by 5 years' probation. *Id*.

146.    Additionally, Defendant Robinson will be registered as a sexual predator. *Id*; *see also* FL ST § 775.21.

**L. Defendants Crews, Messer, Prescott, and the Assailant Defendants Refused to Assist Plaintiff when she Reported Defendant Robinson, and Instead Tortured, Harassed, and Retaliated Against Plaintiff**

147.    Sometime after her May 25, 2019 forcible vaginal and oral rape, Plaintiff reported all prior acts to ICE in an immigration hearing.

148.    In response, Plaintiff was placed in solitary confinement without charge or adjudication, until her release from BCDC on July 30, 2019.

149.    Following Plaintiff's report of her assaults, the Assailant Defendants retaliated against Plaintiff by denying her basic needs, including drinking water, food, bedding, freedom of movement, and the ability to shower freely. Running water in her cell was cut off, and the Assailant Defendants banged on her cell door to keep her awake at night.

150.    On one occasion, the Assailant Defendants retaliated by taking Plaintiff against her will to the law library, which housed the location of her May 25, 2019 rape, and locked her in the law library, causing her to have a mental breakdown, heart palpitations, and difficulty breathing.

151.    Specifically, at Defendant Messer's direction, the Assailant Defendants, including Deputies Young Rhoden and Curry, physically forced Plaintiff into the law library. Defendant Messer made it clear this action was punitive, as the Assailant Defendants knew it would be traumatic for Plaintiff to be in this law library which had been the setting for her recent rape and that Plaintiff would fear a recurrence.

152.    Despite Plaintiff's deteriorating state and pleas for medical assistance, members of the Assailant Defendants refused to help or release her from the law library. Instead, Plaintiff could hear the Assailant Defendants mocking her over the intercom along with the detention officers stationed in the control room.

153.    On another occasion, the Assailant Defendants, including Defendant Prescott and Deputies Kirkland and Young Rhoden, threatened Plaintiff with sexual assault in the shower area. Traumatized, Plaintiff stopped showering, fearing that the Assailant Defendants intended to get her alone and away from cameras to cause harm.

154.    Upon information and belief, the Assailant Defendants then falsified Plaintiff's shower records, inaccurately recording her refusals to shower, perpetuating a false narrative about her behavior and covering up their own misconduct.

155.    On another occasion, the Assailant Defendants instructed the detainee kitchen staff to tamper with Plaintiff's food, including spitting in it. A member of the kitchen staff warned Plaintiff not to eat her meals, as they had been tampered with. Unable to eat, Plaintiff experienced significant weight loss, with an estimated reduction of over 20 pounds.

156.    The Assailant Defendants tormented Plaintiff by consistently shaking a pepper spray can at her cell door, knowing she was allergic to capsaicin.

157.    The Assailant Defendants also limited Plaintiff's access to her family and attorneys by phone or email.

158.    The Assailant Defendants prevented repairs to Plaintiff's solitary confinement cell, leaving her without a flushing toilet and forcing her to go without relieving herself.

159.    The Assailant Defendants also denied Plaintiff toilet paper and feminine pads, causing her to menstruate and bleed on herself.

160.    The retaliatory conduct by the Assailant Defendants occurred with the knowledge of BCDC supervisors, including Defendant Crews, and with the knowledge of Defendant Rhoden.

**M. The Conduct of the Assailant Defendants Was Geared to Make Plaintiff Recant**

161.    The Assailant Defendants relentlessly sought opportunities to subject Plaintiff to disciplinary punishment, aiming to strip her of privileges and coerce her into recanting her report of rape.

162.    Plaintiff was routinely pressured to sign a paper recanting her report of rape.

163.    On one occasion, Deputy Kirkland denied Plaintiff access to the phone to contact her family, admonishing her for "speaking out" and suggesting she could stop the mistreatment by retracting her report of rape by Defendant Robinson.

164.    On another occasion, when Plaintiff drew a cross on her cell wall for religious purposes, members of the Assailant Defendants, including Deputy Kirkland, barged into her solitary confinement cell and threatened her with disciplinary action.

165.    Subsequently, Plaintiff was visited by the BSCO Disciplinary Reason Officer, who acknowledged that the citation was baseless. However, the next day, the Disciplinary Reason Officer informed Plaintiff that the BSCO intended to pursue a citation against her for drawing a cross.

166.    Plaintiff was then visited by Defendant Crews, who attempted to coerce her into signing a paper recanting her statement, suggesting she could end her ordeal by doing so. Despite acknowledging the baselessness of the citation, Defendant Crews appeared to play a dual role, acting as the "good cop" while pressuring Plaintiff to comply.

167.    The complicity of managerial staff further enabled the Assailant Defendants' reign of terror.

168.    One supervisor, Tracey Beazzo, directly oversaw the Assailant Defendants, and not only neglected to intervene but also reportedly coordinated with them.

169.    Another supervisor, Lieutenant Gordon, was complicit in the Assailant Defendants' actions, willfully disregarding Plaintiff's complaints. Despite being informed of the ongoing abuses, Lieutenant Gordon callously dismissed Plaintiff's concerns, effectively ignoring the atrocities under his watch.

170.    The Assailant Defendants orchestrated a campaign to turn others against Plaintiff, deliberately isolating and undermining her.

171.    On one occasion, the Assailant Defendants learned that Plaintiff, still in solitary confinement, was receiving assistance during day shifts from other BSCO deputies. Specifically, two female BSCO deputies had helped Plaintiff meet essential needs, including food, showering, and access to the commissary.

172.    One of these deputies, a short, heavyset Caucasian woman whose name began with a "Y," approached Plaintiff and expressed regret for no longer being able to help her, explaining her personal circumstances, including having two young children and going through a divorce, necessitating she keep her job.

173.    In response, the Assailant Defendants reassigned the two women BSCO deputies to different areas of BCDC, reducing any relief Plaintiff had been receiving in solitary confinement.

**N.  ICE's Failure to Provide Plaintiff With Proper Medical and Mental Health Care**

174.    At BCDC, Plaintiff was assigned an ICE immigration officer, Alberto Cornavaca, who informed her that ICE had conducted a preliminary review of her case. Officer Cornavaca assured her that deportation was unlikely due to her status as a Permanent Resident and emphasized that her primary task was to appear before a judge.

175.     Officer Cornavaca explained that his role included evaluating grounds for deportation among detainees and ensuring their welfare while in ICE detention. He also highlighted his responsibility for identifying factors that could potentially justify deportation.

176.     Officer Cornavaca advised Plaintiff to use the KIOSK electronic messaging system ("KIOSK system"), which detainees used to report conditions at BCDC, to notify ICE of any concerns.

177.     In addition to Officer Cornavaca, four other ICE immigration officers were assigned to BCDC, each with the same responsibilities. All ICE officers at BCDC, including Cornavaca, reported to Defendant Smith.

178.     Shortly after her arrival at BCDC, Plaintiff developed a severe sinus infection that spread to her ear, eye, and mouth, causing significant swelling and illness.

179.     Despite her clear need for medical attention, BCDC staff and ICE officers charged with overseeing her well-being denied her care.

180.     Plaintiff's health deteriorated significantly before her first immigration hearing in March 2019. At the hearing, where her removal petition could have been adjudicated, the Immigration Judge observed Plaintiff's condition and immediately requested medical attention for Plaintiff, emphasizing the urgency of her condition, which postponed her immigration petition.

181.     Plaintiff was subsequently prescribed antibiotics, but they were ineffective due to the advanced stage of her infection, requiring a second, stronger dose, which further exacerbated her illness.

182.     At the Plaintiff's next immigration hearing, approximately one month later, she was still undergoing treatment for her sinus infection and remained on antibiotics.

183.    Despite the ongoing medical care, she had not fully recovered before her second hearing. This preceded her May 2019 sexual assault and rape by Defendant Robinson, leading to another postponement of her immigration hearing.

184.    The neglect persisted, as the Plaintiff was denied proper medical attention after reporting the assault by Robinson.

185.    ICE officers, including Officer Cornavaca and Defendant Smith, disregarded the Plaintiff's written complaints and signs of distress, allowing her condition to deteriorate.

186.    Plaintiff's efforts to seek assistance from ICE officers, including Officer Cornavaca and Defendant Smith, were fruitless, as they refused to facilitate her access to medical treatment.

187.    Plaintiff repeatedly voiced her concerns through the KIOSK System, but received no response, even during ICE visits to BCDC.

188.    Before the incidents involving Robinson, Plaintiff did not express fear and regularly raised concerns to ICE officers about various issues at BCDC.

189.    For instance, she submitted several reports regarding her medical condition, as well as faulty toilets, voyeurism, shower problems, conflicts with other detainees, and poor living conditions, including insufficient bedding, pillows, and torn mattresses. She also reported an incident involving a young male Caucasian officer taking a picture of her in her cell without her consent.

190.    None of these issues were addressed by ICE officers.

191.    After the Plaintiff reported the assault by Robinson and her unlawful placement in solitary confinement at an immigration hearing, she sought assistance from ICE through the KIOSK system regarding her declining health and lack of medical care.

192.    Approximately two days later, Officer Cornavaca visited her in solitary confinement, informing her of an impending release, which did not happen. She remained in solitary confinement for nearly two months.

193.    This led to severe psychological, emotional, and physical health issues, including anxiety, depression, cognitive decline, emotional instability, and sleep disturbances.

194.    Despite this, Plaintiff continued to plead to ICE via the KIOSK system for an adjudication of her confinement, even when it became clear that neither ICE nor Smith would intervene. She resorted to complaining of a lack basic necessities, which she believed ICE could easily verify.

195.    Plaintiff's concerns to ICE included phrases like "I am not doing okay" and inquiries about her hearing schedule, along with complaints about being denied phone access, difficulties with commissary purchases, and lack of access to counsel, hoping to attract ICE's oversight.

196.    On one occasion, she requested to use a private phone in the ICE office, hoping to speak in Romanian or Spanish to report her assault, but struggled to reach anyone who could assist her. Plaintiff was unable to make any call in English due to constant surveillance from the Assailant Defendants.

197.    After weeks of her deteriorating condition in solitary confinement, Plaintiff secured an in-person meeting with Officer Cornavaca, who acknowledged her wrongful placement in solitary confinement, but took no remedial action, leaving her without proper medical care.

198.    Instead, Officer Cornavaca expressed concern for his job security, disclosing his inability to intervene on her behalf, and admitted to being directed by Defendant Smith to ensure her continued isolation and lack of medical care.

**O. Defendant Smith, Acting Under the Color of Law of Federal Authority, Violated Plaintiff's Constitutional Rights**

199. At all relevant times, Defendant Smith was aware that Plaintiff had been denied medical treatment and was unable to participate in an immigration hearing that could have secured her release and prevented the rape.

200. Defendant Smith became aware of Plaintiff's sexual assault and battery after she reported it to ICE.

201. Plaintiff's report included the fact that she was being retaliated against by the Assailant Defendants, as a result of the rape, by being placed in solitary confinement, without adjudication or charge.

202. Defendant Smith declined Plaintiff's request to substantively meet with her and/or investigate the conduct she had endured, including her sexual assault and battery, and her denial of medical and mental healthcare.

203. Defendant Smith ignored the grievances Plaintiff submitted through the KIOSK system while she was detained in solitary confinement for nearly two months without medical and mental healthcare.

204. Specifically, on one occasion, Plaintiff saw Defendant Smith walking past her solitary conferment cell and called out for his assistance, begging and pleading. Defendant Smith responded to Plaintiff that he "had nothing to do" with her complaints and that Plaintiff had to "take it up with Baker."

205. Thereafter, Defendant Smith refused to even approach Plaintiff's solitary confinement cell door to have any audible conversation, resorting to shouting responses to Plaintiff from afar of his refusal to intervene on Plaintiff's behalf.

206.     Eventually, Defendant Smith instructed Sheriff Deputies at BCDC to no longer retrieve him when Plaintiff asked for him.

**P. Defendants Were on Notice of Plaintiff's Claims**

207.     On June 25, 2019, at the direction of Defendant Rhoden, the BCSO initiated an investigation into Defendant Robinson pertaining to Plaintiff's claims and to determine whether Defendant Robinson had violated both Florida statutes and PREA.

208.     At the direction of Defendant Rhoden, the BCSO submitted its investigative file of Defendant Robinson pertaining to Plaintiff's claims to DHS, Office of the Inspector General (OIG) to aid OIG's investigation into Defendant.

209.     At the direction of Defendant Rhoden, the BCSO submitted its investigative file of Defendant Robinson pertaining to Plaintiff's claims to the FDLE. Specifically, on June 26 and July 22 of 2019, Jodi Altman, the Victims Advocate of the BSCO, submitted Plaintiff's DNA to the FDLE for testing of the bra Defendant Robinson ejaculated on during his rape of Plaintiff. On November 9, 2019, Ms. Altman submitted Defendant Robinson's DNA to the FDLE for same.

210.     On October 2, 2019, the Criminal Justice Standards and Training Commission ("CJSTC") notified Defendant Rhoden that the conduct of Defendant Robinson pertaining to Plaintiff's claims may require disciplinary action by the CJSTC.

211.     On June 26, 2019, Defendant Rhoden placed Defendant Robinson on administrative leave.

212.     Thereafter, Defendant Robinson was criminally charged for his conduct described herein and giving rise to Plaintiff's claims. *See State of Florida v. Brian Louis Robinson*, Case No. 02-2019-CF-000382-CFAM (8th Judicial District, Baker County, Florida). Deputy Sheriffs of the BSCO led the criminal investigation into Defendant Robinson leading to these criminal charges.

The BSCO announced that the results of its investigation of Defendant Robinson had found probable cause to arrest him.[8]

213.    Defendants Rhoden, Crews, and Messer were noticed for deposition and deposed in the criminal matter of Defendant Robinson. *Id.*

214.    On December 7, 2020, a prior attorney representing Plaintiff presented notice of Plaintiff's claim in writing to the BCSO, providing Plaintiff's identifying information, and requesting, *inter alia*, from the BCSO all records pertaining to Plaintiff, as well as a complete copy of Defendant Robinson's employment file, including any complaints, disciplinary files, and documents concerning Defendant Robinson's separation from the BCSO, as well as Inspection Reports from June 2017 through June 2019 of BCDC, the IGSA agreement between Defendant BCCMC and the BCSO and applicable to BCDC, and for the BCSO to identify senior official of the BCSO acting as its Agreement Security Officer at BCDC.

215.    On December 9, 2020, the BCSO acknowledged this correspondence. On January 6, 2021, Plaintiff's prior attorney renewed his request to the BCSO for documents relating to Plaintiff's claims. On January 29, 2021, Defendant Rhoden submitted an invoice to Plaintiff's prior attorney for $67.80 for costs associated with producing the documents requested by Plaintiff's prior attorney and concerning Plaintiff's claims. On February 2, 2021, Plaintiff's prior attorney submitted a check for payment to the BCSO and it subsequently produced documents responsive to Plaintiff's claims.

216.    On March 18, 2021, a prior attorney representing Plaintiff presented notice of Plaintiff's claim in writing to Defendant United States.

---

[8]    https://www.facebook.com/BakerCoSO/posts/former-detention-deputy-arrestedsuspect-brian-louis-robinson-27in-june-of-2019-d/3003184806416507/ (last accessed April 30, 2024).

## CAUSES OF ACTION

### Count I
### Negligence
### _Against: Defendant Rhoden_

217.   The factual averments of ¶¶ 5-12, 30-56, 99-173, and 207-216, which are incorporated herein by reference, support this cause of action.

218.   Defendant Rhoden, through his employees, agents, or servants, owed a legal duty to keep Plaintiff reasonably free from injury and harm while Plaintiff was in their custody and control.

219.   Defendant Rhoden, through his and their employees, agents, or servants, breached the duty they owed to Plaintiff.

220.   The negligence and/or recklessness of Defendant Rhoden, jointly and severally, through his employees, agents, or servants, includes, but is not limited to:

a.   failing to control detention officers' and staffs' access to female detainees in isolating settings at BCDC;

b.   failing to install and maintain adequate and functioning video surveillance and security systems;

c.   failing to have sufficient policies, practices, and/or oversight in place to detect and prevent physical and sexual abuse of immigration detainees;

d.   failing to staff BCDC at levels that were sufficient to deter sexual assaults by detention officers and other staff;

e.   failing to select and hire qualified detention officers and staff;

f.   failing to conduct reasonable background checks and investigation into prospective and current detention officers and staff;

g.   failing to appropriately supervise detention officers and staff to reduce the inherent risk of sexual assault within a detention facility setting;

h.   failing to appropriately train detention officers and staff on the inherent risks of sexual assaults within a detention facility setting;

i.   failing to appropriately discipline and report detention officers and staff who were known or suspected of having engaged, participated in, and/or concealed sexual assault;

j.   failing to properly investigate allegations of sexual assault by detainees, staff, or detention officers;

k.   failing to properly control access to female detainees at BCDC;

l.   failing to provide any manner of medical treatment to Plaintiff following her sexual assaults;

m.  failing to recognize that isolated and unmonitored sections of BCDC posed an unreasonable risk of harm to detainees;

n.   failing to hold detention officers and staff accountable for not recognizing and preventing sexual assaults;

o.   maintaining an unacceptable practice and/or custom of allowing male agents, officers, and staff to interact with, move, transport, and/or female individuals alone;

p.   failing to appropriately guard detainees from sexual assault;

q.   violating the BCDC's applicable contracts, policies, and standards designed to prevent physical and sexual assault;

r.   failing to exercise the requisite care and skill ordinarily exercised by similar detention facilities, institutions, agencies, agents, guards, correctional officers, and staff members to detect, deter, and prevent sexual assault and abuse; and

s.   violating the federal and state statutes, regulations and standards governing sexual assaults in detention facility settings, including, but not limited to, 34 U.S.C. § 30301, *et seq.*; 28 C.F.R. §§ 115 *et seq.*; FL ST § 951.221.1; FL ST § 94.011.4b; 2011 PBNDS 2.11.

221.   Defendant Rhoden failed to safekeep, care for, and protect the Plaintiff, who was under his custodial, supervisory, and/or disciplinary authority.

222.   As a direct and/or proximate result of Defendant Rhoden and the actions and/or omissions his employees,' agents,' and servants', Plaintiff suffered and continues to suffer from severe and permanent injuries, including, but not limited to, damage to her right shoulder and breast, including the rupturing and deflation of a breast implant placed in her right breast and

permanent deformity of the right breast, damage to her neck from choking, head pain from her hair being pulled, strains from the twisting of her arms, disfigurement, physical impairments, mental anguish, distress, embarrassment, humiliation, shock, emotional distress with physical manifestations, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, lost wages, future earning capacity and damages in an amount to be proven at trial.

223.    As a direct and/or proximate result of Defendant Rhoden and the actions and/or omissions his employees,' agents,' and servants', Plaintiff was and will continue to be prevented from performing daily activities, and has and will continue to incur medical expenses in an effort to treat her aforesaid conditions.

## Count II
## Negligence
### _Against: Defendant BCCMC_

224.    The factual averments of ¶¶ 4, 23-56, 99-173, and 207-216, which are incorporated herein by reference, support this cause of action.

225.    Defendant BCCMC, as the owner and operator of the BCDC, held a non-delegable duty to maintain the premises in a condition safe for all lawful visitors, including Plaintiff. This duty extends to all aspects of the premises' safety and security, ensuring protection from foreseeable harms.

226.    Defendant BCCMC owed Plaintiff a duty to regularly inspect the premises to identify latent defects or other hazardous conditions that might not be immediately obvious, thereby preventing harm to visitors.

227.    Defendant BCCMC was required to implement and maintain adequate safety and security measures, such as effective access control for female detainees and the installation of functional locks and video surveillance systems, to protect visitors from harm.

228.    It was the duty of Defendant BCCMC to ensure vigilant security and surveillance, particularly in isolated, dark, or remote areas of the premises where the risk of assault or injury might be heightened.

229.    Prior to Plaintiff's sexual assault and battery, including rape, the BCSO sought additional funding from Defendant BCCMC for additional security staff to deter sexual abuse, and upon information belief, funding which was not received in time for additional security staff who could have prevented Plaintiff's sexual assault and battery, including rape.

230.    The condition of the BCDC premises, particularly the isolated area where Plaintiff was detained at the time of the incident, presented an unreasonable risk of harm. This risk was exacerbated by the potential for unauthorized access and isolation of female detainees, facilitating physical and sexual assaults.

231.    Defendant BCCMC was, or should have been, aware of the unreasonable risk of harm, especially given a documented history of sexual abuse and assaults at BCDC, indicating a failure to rectify known security flaws.

232.    Defendant BCCMC breached its duty of care through multiple failures, including not maintaining the premises safely, not conducting adequate inspections to discover and remedy dangers, not securing areas accessible to detainees, not installing or maintaining necessary safety and security measures, and failing to prevent the isolation of Plaintiff in a vulnerable location.

233.    The negligent and/or reckless acts and omissions of Defendant BCCMC, and their employees, agents, and servants directly and proximately caused the injuries and damages sustained by Plaintiff.

234.    As a direct and proximate result of Defendant BCCMC's actions and inactions, Plaintiff has suffered severe and permanent injuries, including physical injuries to her right

shoulder and breast, emotional and psychological distress, and economic losses due to medical expenses and lost earning capacity. These injuries have led to significant pain and suffering, loss of enjoyment of life, and other compensable damages, all to be detailed and proven at trial.

235.    As a direct and/or proximate result of Defendant BCCMC, Plaintiff was and will continue to be prevented from performing daily activities, and has and will continue to incur medical expenses in an effort to treat her aforesaid conditions.

### Count III
### Assault & Battery
### *Against: Defendant Robinson*

236.    As previously alleged in ¶¶ 9 and 118-146, which are incorporated herein by reference, Defendant Robinson intentionally, knowingly, or recklessly made a harmful and/or offensive contact with Plaintiff's person.

237.    Defendant Robinson encountered Plaintiff in isolated areas of BCDC with specific the intent to assault Plaintiff physically and sexually and/or to cause a reasonable apprehension of immediate bodily harm.

238.    Defendant Robinson intentionally, knowingly, or recklessly physically attacked Plaintiff and touched her person in a sexual manner, where Plaintiff did not consent to the sexual touching.

239.    Defendant Robinson intentionally, knowingly, or recklessly caused a reasonable apprehension of immediate bodily harm to Plaintiff.

240.    The conduct of Defendant Robinson was harmful and offensive and caused bodily injury to Plaintiff.

241.    Defendant Robinson knew or reasonably should have known that his contact with Plaintiff's body was harmful and offensive.

242.    As a direct and/or proximate result of Defendant Robinson, Plaintiff suffered and continues to suffer from severe and permanent injuries, including, but not limited to, damage to her right shoulder and breast, including the rupturing and deflation of a breast implant placed in her right breast and permanent deformity of the right breast, damage to her neck from choking, head pain from her hair being pulled, strains from the twisting of her arms, disfigurement, physical impairments, mental anguish, distress, embarrassment, humiliation, shock, emotional distress with physical manifestations, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, lost wages, future earning capacity and damages in an amount to be proven at trial.

243.    As a direct and/or proximate result of Defendant Robinson, Plaintiff was and will continue to be prevented from performing daily activities, and has and will continue to incur medical expenses in an effort to treat her aforesaid conditions.

**Count IV**
**Assault & Battery**
***Against: Defendants Messer, Prescott, and the Assailant Defendants***

244.    As previously alleged in ¶¶ 10-12 and 147-173, which are incorporated herein by reference, Defendants Messer, Prescott, and the Assailant Defendants, acted in concert to intentionally, knowingly, or recklessly made a harmful and/or offensive contact with Plaintiff's person by, among other things, taking her to the location of which she was raped by Defendant Robinson, and among other things, retaliating against Plaintiff in solitary confinement.

245.    Defendants Messer, Prescott, and the Assailant Defendants encountered Plaintiff with specific the intent to physically assault the Plaintiff and/or to cause a reasonable apprehension of immediate bodily harm d by retaliating against Plaintiff.

246.    Defendants Messer, Prescott, and the Assailant Defendants intentionally, knowingly, or recklessly physically attacked Plaintiff and touched her person, where Plaintiff did not consent to the touching.

247.    Defendants Messer, Prescott, and the Assailant Defendants intentionally, knowingly, or recklessly caused a reasonable apprehension of immediate bodily harm to Plaintiff.

248.    The conduct of Defendants Messer, Prescott, and the Assailant Defendants was harmful and offensive and caused bodily injury to Plaintiff.

249.    As a direct and proximate result of the conduct of Defendants Messer, Prescott, and the Assailant Defendants, Plaintiff suffered the aforesaid damages.

250.    As a direct and/or proximate result of Defendants Messer, Prescott, and the Assailant Defendants, Plaintiff suffered and continues to suffer from severe and permanent injuries, including, but not limited to, damage to her right shoulder and breast, including the rupturing and deflation of a breast implant placed in her right breast and permanent deformity of the right breast, damage to her neck from choking, head pain from her hair being pulled, strains from the twisting of her arms, disfigurement, physical impairments, mental anguish, distress, embarrassment, humiliation, shock, emotional distress with physical manifestations, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, lost wages, future earning capacity and damages in an amount to be proven at trial.

251.    As a direct and/or proximate result of Defendants Messer, Prescott, and the Assailant Defendants, Plaintiff was and will continue to be prevented from performing daily activities, and has and will continue to incur medical expenses in an effort to treat her aforesaid conditions.

**Count V**
**False Imprisonment**
*Against: Defendants Robinson*

252.    As previously alleged in ¶¶ 9 and 118-146, which are incorporated herein by reference, Defendant Robinson falsely imprisoned Plaintiff by willfully detaining her without her consent and in the absence of any legal authority or justification for doing so, by moving Plaintiff to the isolated area of BCDC and/or holding Plaintiff in the isolated area to facilitate his physical and sexual assaults on Plaintiff.

253.    Plaintiff knew that she was willfully and unlawfully detained by Defendant Robinson at the time of his physical and sexual assaults upon her, and she did not consent to it.

254.    Defendant Robinson engaged in this conduct with malice and reckless or callous indifference to the rights of Plaintiff.

255.    As a direct and/or proximate result of Defendant Robinson, Plaintiff suffered and continues to suffer from severe and permanent injuries, including, but not limited to, damage to her right shoulder and breast, including the rupturing and deflation of a breast implant placed in her right breast and permanent deformity of the right breast, damage to her neck from choking, head pain from her hair being pulled, strains from the twisting of her arms, disfigurement, physical impairments, mental anguish, distress, embarrassment, humiliation, shock, emotional distress with physical manifestations, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, lost wages, future earning capacity and damages in an amount to be proven at trial.

256.    As a direct and/or proximate result of Defendant Robinson, Plaintiff was and will continue to be prevented from performing daily activities, and has and will continue to incur medical expenses in an effort to treat her aforesaid conditions.

**Count VI**
**False Imprisonment**
*Against: Defendants Messer, Prescott, and the Assailant Defendants*

257.     As previously alleged in ¶¶ 10-12 and 147-173, which are incorporated herein by reference, Defendants Messer, Prescott, and the Assailant Defendants, acting in concert, falsely imprisoned Plaintiff by willfully detaining in the location in which she was raped by Defendant Robinson and by detaining her in solitary confinement without her consent and in the absence of any legal authority or justification for doing so, and solely to retaliate against her for reporting her physical and sexual assaults.

258.     Plaintiff knew that she was willfully and unlawfully detained by Defendants Messer, Prescott, and the Assailant Defendants at the time they placed her in solitary confinement for reporting her physical and sexual assaults.

259.     Defendants Messer, Prescott, and the Assailant Defendants engaged in this conduct with malice and reckless or callous indifference to the rights of Plaintiff.

260.     As a direct and/or proximate result of Defendants Messer, Prescott, and the Assailant Defendants, Plaintiff suffered and continues to suffer from severe and permanent injuries, including, but not limited to, damage to her right shoulder and breast, including the rupturing and deflation of a breast implant placed in her right breast and permanent deformity of the right breast, damage to her neck from choking, head pain from her hair being pulled, strains from the twisting of her arms, disfigurement, physical impairments, mental anguish, distress, embarrassment, humiliation, shock, emotional distress with physical manifestations, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, lost wages, future earning capacity and damages in an amount to be proven at trial.

261.     As a direct and/or proximate result of Defendants Messer, Prescott, and the Assailant Defendants, Plaintiff was and will continue to be prevented from performing daily activities, and has and will continue to incur medical expenses in an effort to treat her aforesaid conditions.

### Count VII
### Intentional Infliction of Emotional Distress
### *Against: Defendants Robinson*

262.     As previously alleged in ¶¶ 9 and 118-146, which are incorporated herein by reference, on multiple occasions Defendant Robinson brutally attacked and sexually assaulted Plaintiff and throughout the periods of this abuse, threatened, harassed, and tormented Plaintiff.

263.     Defendants Robinson acted intentionally or recklessly and inflicted emotional distress on Plaintiff.

264.     The conduct of Defendant Robinson was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

265.     Defendant Robinson engaged in this conduct with malice and reckless or callous indifference to the rights of Plaintiff.

266.     The emotional distress suffered by Plaintiff as a result of the conduct of Defendants Robinson was severe.

267.     Plaintiff's injuries were a direct and/or proximate result of Defendant Robinson's intentional infliction of emotional distress.

268.     As a direct and/or proximate result of Defendant Robinson, Plaintiff suffered and continues to suffer from severe and permanent injuries, including, but not limited to, damage to her right shoulder and breast, including the rupturing and deflation of a breast implant placed in

her right breast and permanent deformity of the right breast, damage to her neck from choking, head pain from her hair being pulled, strains from the twisting of her arms, disfigurement, physical impairments, mental anguish, distress, embarrassment, humiliation, shock, emotional distress with physical manifestations, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, lost wages, future earning capacity and damages in an amount to be proven at trial.

269.    As a direct and/or proximate result of Defendant Robinson, Plaintiff was and will continue to be prevented from performing daily activities, and has and will continue to incur medical expenses in an effort to treat her aforesaid conditions.

**Count VIII**
**Intentional Infliction of Emotional Distress**
***Against: Defendants Crews, Messer, Prescott, and the Assailant Defendants***

270.    As previously alleged in ¶¶ 10-12, and 147-173, which are incorporated herein by reference, Defendants Crews, Messer, Prescott, and the Assailant Defendants, acted in concert to retaliate against Plaintiff, thereby inflicting emotional distress on Plaintiff.

271.    Defendants Crews, Messer, Prescott, and the Assailant Defendants acted intentionally or recklessly and inflicted emotional distress on Plaintiff.

272.    The conduct of Defendants Crews, Messer, Prescott, and the Assailant Defendants was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

273.    Defendants Crews, Messer, Prescott, and the Assailant Defendants engaged in this conduct with malice and reckless or callous indifference to the rights of Plaintiff.

274.    The emotional distress suffered by Plaintiff as a result of the conduct of Defendants Crews, Messer, Prescott, and the Assailant Defendants was severe.

275.    Plaintiff's injuries were a direct and/or proximate result of Defendants Crews, Messer, Prescott, and the Assailant Defendants' intentional infliction of emotional distress.

276.    As a direct and/or proximate result of Defendants Messer, Prescott, and the Assailant Defendants, Plaintiff suffered and continues to suffer from severe and permanent injuries, including, but not limited to, damage to her right shoulder and breast, including the rupturing and deflation of a breast implant placed in her right breast and permanent deformity of the right breast, damage to her neck from choking, head pain from her hair being pulled, strains from the twisting of her arms, disfigurement, physical impairments, mental anguish, distress, embarrassment, humiliation, shock, emotional distress with physical manifestations, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, lost wages, future earning capacity and damages in an amount to be proven at trial.

277.    As a direct and/or proximate result of Defendants Messer, Prescott, and the Assailant Defendants, Plaintiff was and will continue to be prevented from performing daily activities, and has and will continue to incur medical expenses in an effort to treat her aforesaid conditions.

## Count IX
### Federal Tort Claims Act – Negligence
### _Against: Defendant United States_

278.    The factual averments of ¶¶ 14-15, 40-89, and 99-206, which are incorporated herein by reference, support this cause of action.

279.    All conditions precedent to bring suit against the United States under the Federal Tort Claims Act have occurred or been performed.

280.    The United States has waived its sovereign immunity pursuant to 28 U.S.C. §§ 1346(b) and 2674.

281.    As set forth in this Complaint, Plaintiff suffered personal injury and incurred damages proximately caused by the negligent or wrongful acts or omissions of employees, agents, and/or servants of the United States government, including but not limited to employees, agents, and/or servants of the ICE, the DHS. These employees and agents were acting in the course and scope of their employment or agency with the United States government when they committed acts or omissions that perpetrated, allowed, and/or failed to prevent the attack and sexual assault of Plaintiff while she was in the custody, care, and control of the United States government at BCDC. At all times relevant, these employees, agents, and/or servants constituted investigative or law enforcement officers. The United States government, if it were an individual person, would be liable to Plaintiff under the law of the state of Florida for these acts and omissions as set forth herein.

282.    Defendant United States, by and through its employees, agents, or servants, owed a legal duty to keep Plaintiff reasonably free from injury and harm while Plaintiff was in its custody and control.

283.    Defendant United States, by and through its employees, agents, or servants, breached the duty it owed to Plaintiff.

284.    The negligence and/or recklessness of Defendant United States, by and through its employees, agents, or servants, includes, but is not limited to:

   a.  failing to adequately implement, monitor, and enforce BCDC's compliance with ICE's stringent mandates and policies on sexual abuse and assault;

   b.  failing to protect Plaintiff from Defendant Robinson, thereby subjecting her to ongoing risk and harassment even after she reported her rape and sexual assaults;

   c.  failing to monitor and prevent retaliation and further harm to Plaintiff following her reports of rape and sexual assaults;

d.  failing to address and respond to Plaintiff's grievances reporting retaliation, thereby neglecting the essential channels of communication and protection for victims under ICE custody;

e.  failing to ensure that Plaintiff received the comprehensive medical and mental health services mandated for victims of sexual assault under ICE custody;

f.  failing to prevent Plaintiff from being placed in solitary confinement for nearly two months, directly contravening ICE directives aimed at providing the least restrictive and most supportive environment, especially for vulnerable individuals;

g.  failing to uphold the strict policy against retaliation, as demonstrated by the inappropriate placement of the victim in solitary confinement after she reported abuse;

h.  failing to regularly assess the appropriateness of solitary confinement for the Plaintiff, thereby violating ICE's standards and policies;

i.  failing to consider and adequately address the specific needs and rights of the Plaintiff, identified as a detainee with special vulnerabilities, in direct violation of ICE's mandates;

j.  failing to conduct mandatory reviews regarding decisions to place Plaintiff in solitary confinement, as required by ICE policies;

k.  failing to provide transparent reporting and oversight mechanisms, which are indispensable for ensuring accountability and safeguarding the rights of detainees.

285.    As a direct and/or proximate result of Defendant United States' and the actions and/or omissions its employees,' agents,' and servants', Plaintiff suffered and continues to suffer from severe and permanent injuries, including, but not limited to, damage to her right shoulder and breast, including the rupturing and deflation of a breast implant placed in her right breast and permanent deformity of the right breast, damage to her neck from choking, head pain from her hair being pulled, strains from the twisting of her arms, disfigurement, physical impairments, mental anguish, distress, embarrassment, humiliation, shock, emotional distress with physical manifestations, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, lost wages, future earning capacity and damages in an amount to be proven at trial.

286.    As a direct and/or proximate result of Defendant United States' and the actions and/or omissions its employees,' agents,' and servants', Plaintiff was and will continue to be prevented from performing daily activities, and has and will continue to incur medical expenses in an effort to treat her aforesaid conditions.

### Count X
### Federal Tort Claims Act – False Imprisonment
### _Against: Defendant United States_

287.    The factual averments of ¶¶ 14-15, 40-89, and 99-206, which are incorporated herein by reference, support this cause of action.

288.    As set forth in this Complaint, the United States has waived its sovereign immunity pursuant to 28 U.S.C. §§ 1346(b) and 2674.

289.    At all times relevant, Defendant United States' employees, agents, or servants within BCDC were acting as investigative or law enforcement officers.

290.    The Plaintiff, an ICE detainee with specific vulnerabilities, was placed in solitary confinement for nearly two months following a report of rape. This confinement followed Plaintiff's report of being raped, suggesting a punitive or retaliatory motive, thereby making the confinement intentional.

291.    The Defendant United States, through its employees, agents, or servants, intentionally subjected the Plaintiff to solitary confinement without adequate justification, review, or oversight. This action isolated the Plaintiff from the general detainee population and occurred subsequent to the Plaintiff reporting a rape, indicating a potential punitive or retaliatory motive.

292.    The Plaintiff did not consent to solitary confinement, which was enforced by the Defendant United States' employees, agents, or servants despite objections from the Plaintiff, meeting the criteria for non-consensual false imprisonment.

293.    The prolonged solitary confinement of the Plaintiff exceeded any lawful authority or administrative justification outlined in ICE policies. These policies mandate regular review and oversight, particularly for vulnerable detainees, which were neglected in this instance, rendering the confinement unlawful.

294.    The Plaintiff was aware of being confined against her will and experienced significant harm as a consequence.

295.    ICE directives require that solitary confinement be reviewed after 14 days and at regular intervals thereafter, especially in cases involving heightened vulnerabilities. Despite these guidelines, the Plaintiff's confinement was not appropriately reviewed, and alternative measures were not considered, representing a failure in duty and oversight by the Defendant.

296.    As a direct and foreseeable consequence of the actions and/or omissions of the Defendant United States and its employees, agents, and servants, the Plaintiff was falsely imprisoned in solitary confinement, resulting in significant physical and psychological harm, exacerbating the trauma of her previous assault, and violating her rights under federal detention standards.

297.    As a direct and/or proximate consequence of the actions and/or omissions of the Defendant United States and its employees, agents, and servants, the Plaintiff has been and will continue to be prevented from engaging in daily activities and has and will continue to incur medical expenses in an effort to address her aforementioned conditions.

**Count XI**
**Violation of the TVPA, 18 U.S.C. § 1581 *et. seq***
*__Against: Defendant Robinson__*

298.    Defendant Robinson engaged in sex trafficking of Plaintiff as prohibited under 18 U.S.C. § 1591; § 1594(a).

299.     As previously alleged in ¶¶ 9, 90-98, and 18-146, which are incorporated herein by reference, Defendant Robinson coerced Plaintiff to engage in sexual acts by means of force as well as giving her commercial goods at BCDC, which constitute things of value. In this way, Defendant Robinson's conduct constitutes the attempt to engage in sex in exchange for things of value, the definition of commerciality under the TVPA. Because he attempted to engage the Plaintiff in commercial sex using force, fraud, and/or coercion, he attempted to engage her in sex trafficking.

300.     Defendant Robinson coerced Plaintiff with his threats of harm. Defendant Robinson's promises and threats were a plan designed to make Plaintiff believe that she would suffer serious harm should she not obey his sexual advances.

301.     Defendant Robinson also used the coercive power of his status as a Sheriff's Deputy, as well as physical force in his attempt to have Plaintiff engage in commercial sexual acts with him.

302.     These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18 U.S.C. § 1595.

303.     Defendant Robinson's conduct warrants the Court's imposition of punitive damages.

304.     Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for Defendant Robinson's wrongful conduct.

**Count XII**
**Violation of the TVPA, 18 U.S.C. § 1581 *et. seq***
***Against: Defendants Baker County, BCCMC, and Rhoden***

305.     The factual averments of ¶¶ 3-5, 30-44, 17-98, and 118-206, which are incorporated herein by reference, support this cause of action.

306.    At all relevant times, Defendants Baker County, BCMCC and Rhoden participated in the venture that is BCDC.

307.    Defendants Baker County, BCMCC and Rhoden knew or should have known that Defendant Robinson had engaged in commercial sex acts with Plaintiff in violation of the TVPA.

308.    Defendants Baker County, BCMCC and Rhoden knew or should have known that Defendants Crews, Messer, Prescott, and the Assailant Defendants were obstructing and attempting to obstruct enforcement efforts against Defendant Robinson for conduct which violated the TVPA.

309.    Defendants Baker County, BCMCC and Rhoden gained numerous financial and valuable benefits from protecting, participating in, and aiding these TVPA violations and were incentivized to ignore these TVPA violations.

310.    Specifically, Defendants Baker County, BCMCC and Rhoden benefitted from the employment of Defendant Robinson and took no action against Defendant Robinson while he perpetuated commercial sex acts on Plaintiff. In fact, throughout the time that Defendant Robinson perpetuated conduct which violated the TVPA, he continued to work as a Deputy Sherriff overseeing detainees in BCDC. Defendant Robinson was never disciplined by Defendants Baker County, BCMCC and Rhoden for engaging in commercial sexual acts with Plaintiff.

311.    Defendants Baker County, BCMCC and Rhoden also benefitted from the employment of Defendants Crews, Messer, Prescott, and the Assailant Defendants and took no action against them while they obstructed and attempted to obstruct enforcement efforts against Defendant Robinson for conduct which violated the TVPA.

312.    Because Defendants Robinson, Crews, Messer, Prescott, and the Assailant Defendants acted at all times in their roles as Deputy Sheriffs, they acted as agents of Defendants

Baker County and BCMCC and of the BCSO, which are vicariously liable for trafficking of Plaintiff.

313.    The potential loss of the ICE contract posed substantial financial risks to BCDC, possibly leading to insolvency and the need for increased taxpayer contributions to support the facility. This precarious financial situation provided Defendants Baker County, BCMCC, and Rhoden with a compelling incentive to disregard the TVPA violations occurring within BCDC in order to maintain their financial and contractual standing.

314.    These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18 U.S.C. § 1595.

315.    The conduct of Defendants Baker County, BCMCC and Rhoden warrants the Court's imposition of punitive damages.

316.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the wrongful conduct of Defendants Baker County, BCMCC and Rhoden.

**Count XIII**
**Violation of the TVPA, 18 U.S.C. § 1581 *et. seq***
***Against: Defendants Crews, Messer, Prescott, and the Assailant Defendants***

317.    As previously alleged ¶¶ 6-12, 90-98, and 147-173, which are incorporated herein by reference, Defendants Crews, Messer, Prescott, and the Assailant Defendants each obstructed and attempted to obstruct enforcement efforts against Defendant Robinson for conduct which violated the TVPA.

318.    Defendants Crews, Messer, Prescott, and the Assailant Defendants gained numerous financial and valuable benefits from protecting, participating, and aiding these TVPA

violations, by being able to maintain their employment as Deputy Sheriffs overseeing detainees in BCDC.

319.    These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18 U.S.C. § 1595.

320.    The conduct of Defendants Crews, Messer, Prescott, and the Assailant Defendants warrants the Court's imposition of punitive damages.

321.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the wrongful conduct of Defendants Crews, Messer, Prescott, and the Assailant Defendants.

**Count XIV**
**42 U.S.C. § 1983 — 14th Amendment Substantive Due Process Violation**
***Against: Defendant Robinson***

322.    As previously alleged in ¶¶ 9 and 118-146, which are incorporated herein by reference, Defendant Robinson subjected Plaintiff to repeated sexual assault and sex-trafficked her while she was in custody at BCDC, and then attempted to conceal this nightmarish conduct.

323.    Defendants Robinson knew that, by engaging in this conduct, he was certain to cause physical and mental injury to Plaintiff.

324.    Defendants Robinson intentionally disregarded the obvious risk to Plaintiff despite the fact that their conduct could not justify any legitimate government interest.

325.    The conduct of Defendants Robinson constitutes a state created danger and rises to a level of egregiousness that shocks the conscious.

326.    As a result of the above actions, Defendants Robinson caused Plaintiff to be deprived of her clearly established right to intimate bodily integrity and have therefore violated

Plaintiff's Fourteenth Amendment right under the United States Constitution to substantive due process of law.

327.    As a direct and/or proximate result of Defendant Robinson, Plaintiff suffered and continues to suffer from severe and permanent injuries, including, but not limited to, damage to her right shoulder and breast, including the rupturing and deflation of a breast implant placed in her right breast and permanent deformity of the right breast, damage to her neck from choking, head pain from her hair being pulled, strains from the twisting of her arms, disfigurement, physical impairments, mental anguish, distress, embarrassment, humiliation, shock, emotional distress with physical manifestations, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, lost wages, future earning capacity and damages in an amount to be proven at trial.

328.    As a direct and/or proximate result of Defendant Robinson, Plaintiff was and will continue to be prevented from performing daily activities, and has and will continue to incur medical expenses in an effort to treat her aforesaid conditions.

### Count XV
### 42 U.S.C. § 1983 — 14th Amendment Substantive Due Process Violation
### *Against: Defendants Crews, Messer, Prescott, and the Assailant Defendants*

329.    As previously alleged in ¶¶ 6-12, 90-98, and 147-173, which are incorporated herein by reference, Defendants Crews, Messer, Prescott, and the Assailant Defendants, acted in concert to retaliate against Plaintiff to conceal the conduct of Defendant Robinson.

330.    Defendants Crews, Messer, Crews, and the Assailant Defendants knew or should have known that Plaintiff had been subject to abusive conduct by Defendant Robinson, but failed to intervene on behalf of Plaintiff and/or aided Defendant Robinson in his effort to conceal the abuse.

331.    As detailed throughout this Complaint, Defendants Crews, Messer, Prescott, and the Assailant Defendants, acted in concert to retaliate against Plaintiff to conceal the conduct of Defendant Robinson.

332.    Defendants Crews, Messer, Prescott, and the Assailant Defendants knew that, by engaging in this conduct, they were certain to cause physical and mental injury to Plaintiff.

333.    Defendants Crews, Messer, Prescott, and the Assailant Defendants intentionally disregarded the obvious risk to Plaintiff despite the fact that their conduct could not justify any legitimate government interest.

334.    The conduct of Defendants Crews, Messer, Prescott, and the Assailant Defendants constitutes a state created danger and rises to a level of egregiousness that shocks the conscious.

335.    As a result of the above actions, Defendants Crews, Messer, Prescott, and the Assailant Defendants caused Plaintiff to be deprived of her clearly established right to intimate bodily integrity and have therefore violated Plaintiff's Fourteenth Amendment right under the United States Constitution to substantive due process of law.

## Count XVI
## 42 U.S.C. § 1983 — 14th Amendment Substantive Due Process Violation
### *Against: Defendant Rhoden*

336.    The factual averments of ¶¶ 5-12, 30-56, 99-173, and 207-216, which are incorporated herein by reference, support this cause of action.

337.    As detailed throughout this Complaint, Defendant Robinson subjected Plaintiff to repeated sexual assault and sex-trafficked her while she was in custody at BCDC, and then attempted to conceal this nightmarish conduct.

338. As detailed throughout this Complaint, Defendants Crews, Messer, Prescott, and the Assailant Defendants, acted in concert to retaliate against Plaintiff to conceal the conduct of Defendant Robinson.

339. Defendant Rhoden knew or should have known that Plaintiff had been subject to the aforementioned abusive conduct by Defendants Robinson, Crews, Messer, Prescott, and the Assailant Defendants, but failed to intervene on behalf of Plaintiff and/or aided Defendant Robinson in his effort to conceal the abuse.

340. Defendant Rhoden knew that, by failing to act, as the chief law enforcement official in Baker County and the chief custodian of BCDC, that he was certain to cause physical and mental injury to Plaintiff.

341. Defendants Rhoden intentionally disregarded the obvious risk to Plaintiff despite the fact that his failure to act could not justify any legitimate government interest.

342. The conduct of Defendant Rhoden constitutes a state created danger and rises to a level of egregiousness that shocks the conscious.

343. As a result of the above actions, Defendant Rhoden caused Plaintiff to be deprived of her clearly established right to intimate bodily integrity and have therefore violated Plaintiff's Fourteenth Amendment right under the United States Constitution to substantive due process of law.

**Count XVII**
**42 U.S.C. § 1983 — MONELL LIABILITY**
***Against: Defendants BCCMC and Baker County***

344. The factual averments of ¶¶3-4, 23-39, and 99-173, which are incorporated herein by reference, support this cause of action.

345.    Defendants Robinson, Rhoden, Crews Blue, Messer, Prescott, and the Assailant Defendants acted under the color of law, and under the authority of one or more interrelated *de facto* policies, practices, and/or customs of the BCCMC and Baker County to violate Plaintiff's rights as set forth herein.

346.    Prior to April 2019, it was a *de facto* policy, practice, and/or custom of the BCCMC and Baker County, through their Sheriff's department personnel and elected and appointed county officials, to inadequately supervise and train their Sheriff's Deputies and BCDC staff, including the those specifically identified herein, to appropriately prevent and identify sexual assaults and sexually exploitative conduct occurring to female detainees within BCDC, thereby failing to adequately discourage constitutional violations on the part of the Sheriff's Deputies and staff members.

347.    Prior to April 2019, it was a *de facto* policy, practice, and/or custom of the BCCMC and Baker County, through their Sheriff's department personnel and elected and appointed county officials, to inadequately supervise and train their Sheriff's Deputies and BCDC staff, including the those specifically identified herein, to intervene and/or report constitutional violations and/or misconduct committed by their fellow Sheriff's Deputies and/or BCDC staff.

348.    BCCMC and Baker County, acting through their Sheriff's department personnel and elected and appointed county officials, have adopted and continue to maintain recognized and accepted policies, customs, and/or practices of systematically failing to prevent and identify sexual assaults and sexually exploitative conduct occurring to female detainees within BCDC, failing to investigative reports of sexual assault and sexually exploitative conduct to occurring to female detainees within BCDC, disregarding and/or devaluing reports of sexual assault and sexually exploitative conduct to occurring to female detainees within BCDC, concealing sexual assaults

and sexually exploitative conduct occurring to female detainees within BCDC, and retaliating against those who sought to expose sexual assaults and sexually exploitative conduct occurring to female detainees within BCDC, which has resulted in subjecting other persons, including Plaintiff, to unjustifiable risks of personal injury.

349.    BCCMC and Baker County, acting through their Sheriff's department personnel and elected and appointed county officials, were fully aware of the propensity for sexual assaults and sexually exploitative conduct at BCDC, the risks posed by such conduct, and the resultant need for proper training and supervision of their Sheriff's Deputies and BCDC staff, but BCCMC and Baker County were deliberately indifferent to those risks and failed to properly train and supervise these actors regarding those risks.

350.    As a result of the above-described practices, policies, and/or customs, Sheriff's deputies and BCDC staff, including those identified herein, believed that their actions would not be properly monitored by supervisors and/or other employees of BCCMC and Baker County, and that their improper conduct would not be investigated or sanctioned, but would be tolerated and condoned by BCCMC and Baker County.

351.    As a result of the above actions, BCCMC and Baker County caused Plaintiff to be deprived of her right to intimate bodily integrity and have therefore violated Plaintiff's Fourteenth Amendment right under the United States Constitution to substantive due process of law.

**Count XVIII**
**5th Amendment Due Process Violation — BIVENS LIABILITY**
***Against: Defendant Smith***

352.    At all relevant times, Plaintiff was a civil detainee at BCDC.

353.    As previously alleged in ¶¶ 13, 51-89, and 174-206, which are incorporated herein by reference, Defendant Smith, acting under color of federal law, knew that Plaintiff had been subject to sexual assaults.

354.    Defendant Smith knew that sexual assault and battery, including rape, require prompt medical and mental health treatment and, further, that the sexual assaults Plaintiff had been subjected to resulted in physical injury, such as the rupture of Plaintiff's right breast implant.

355.    Defendant Smith knew that the retaliatory conduct Plaintiff was experiencing at BCDC from reporting her sexual assaults and battery, including rape, resulted in her being unlawfully placed in solitary confinement and denied access to the medical care.

356.    Additionally, Defendant Smith, acting under color of federal law, knew that Plaintiff had developed an infection that precluded her ability to participate in an immigration hearing, in which she could have been released from BCDC, and thus subjected her to continued sexual assault.

357.    Defendant Smith, acting under color of federal law, knew that Plaintiff's conditions were serious medical needs requiring prompt medical treatment, but nevertheless denied her treatment because he was deliberately indifferent to her serious medical needs.

358.    By displaying deliberate indifference to Plaintiff's serious medical needs, Defendant Smith caused Plaintiff to be subjected to conduct that is tantamount to cruel and unusual punishment and thus, in the context of a civil detainee, caused Plaintiff to be deprived of her Fifth Amendment right under the United States Constitution to substantive due process of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests damages and judgment against Defendants which includes the following:

a)      Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to pain and suffering, medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, psychological and emotional pain, suffering, distress, injury, violation of Plaintiff's Federal and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

b)      Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

c)      Reasonable and statutory attorney fees, pre-judgment and post-judgment interest, and costs; and

d)      Other and further relief which may seem just and reasonable under the circumstances.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff respectfully requests a trial by jury as to all matters so triable.

Respectfully submitted this 6th day of May 2024.

Respectfully submitted,

/s/ *Samuel Mukiibi*
Mark W. Tanner, Esq.
Samuel Mukiibi, Esq.
FELDMAN SHEPHERD
WOHLGELERNTER TANNER
WEINSTOCK DODIG
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Tel: (215) 567-8300
mtanner@feldmanshepherd.com
smukiibi@feldmanshepherd.com

James C. Poindexter , Esq.
Florida Bar No.: Bar #116039
DELEGAL & POINDEXTER, P.A.
424 East Monroe Street,

Jacksonville, FL 32202
Tel: (904) 633-5000
james@delegal.net

*Attorneys for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 6th of May 2024, a true and correct copy of the foregoing was electronically filed in the United States District Court for the Middle District of Florida using the CM/ECF system, which will send a notice of electronic filing to counsel of record. A true and correct copy of the foregoing was served on the following unrepresented party, via First Class Mail at the following address:

Brian Louis Robinson
ID Number: BCSO19MN*******
Bradford County Sheriff's Office
945-B N Temple Avenue
Starke, FL 32091
*Unrepresented Party*

*<u>/s/ Samuel Mukiibi</u>*
Samuel Mukiibi